**REVISED AUGUST 19, 1999**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 97-30729

DENNIS THERIOT; ANN RODRIQUEZ; RONALD PERRIN;
NORMAN A. RONQUILLE; DAVID J. POWELL; IRIS C. ISENMANN;
HERMAN J. CARBO; MAPPLEWOOD CIVIC ASSOCIATION, INC.,

Plaintiffs-Appellants,

versus

PARISH OF JEFFERSON, State of Louisiana; T. J. WARD, also known as
Butch; DONALD JONES; EDMOND MUNIZ; NICK GIAMBELLUCA,
in his official capacity as member of the Parish Council, Parish of Jefferson,
State of Louisiana; TIM COULON, in his official capacity as Chairman of the
Jefferson Parish Council; LLYOD F. GIARDINA; JOHN LAVARINE, in his
official capacity as member of the Jefferson Parish Council;

Defendants-Appellees,

UNITED STATES OF AMERICA; DEPARTMENT OF JUSTICE,

Intervenor Defendants-Appellees,

THE COUNCIL OF THE CITY OF KENNER; TERRY McCARTHY;
BETTY BONURA; MARC JOHNSON; JEANNIE BLACK;
JOHN LAVARINE, III; MICHELE BRANIGAN; PHIL CAPITANO,

Intervenors-Appellees.

Appeal from the United States District Court
for the Eastern District of Louisiana

August 17, 1999

Before DAVIS, STEWART, and PARKER, Circuit Judges.

CARL E. STEWART, Circuit Judge:

In this appeal, we must decide whether appellants were entitled to prevail at the bench trial on their claim that the Third Councilmanic District of the Parish of Jefferson is unconstitutional because it results from a racial gerrymander in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and of 42 U.S.C. § 1983.

I

A

The Parish of Jefferson ("Jefferson Parish" or the "Parish") is a political subdivision of the State of Louisiana. Pursuant to the Jefferson Parish Home Rule Charter ("Home Rule Charter"), Jefferson Parish is governed by a Parish President and a council that is comprised of seven members. The Jefferson Parish Council (the "Council") is authorized to manage and to operate the Parish government. Jefferson Parish utilizes a majority vote requirement in its councilmanic elections under the terms of its Home Rule Charter.

Since January 1986,[1] several cases pertaining to the constitutionality of Jefferson Parish's councilmanic districts have been filed in federal court.[2] In the first case, Floyd v. Parish of Jefferson,

---

[1]According to the 1980 United States Census, blacks in Jefferson Parish comprised 13.86% of the total population, and 11.78% of the voting age population. Jefferson Parish had a total population of 454,592 persons and a black population of 63,001. The voting age population included 314,323 persons, of whom 268,878 were white and 37,039 were black. There were 197,376 registered voters in the Parish of whom 23,381 were black.

[2]Pursuant to 1957 revisions to the Jefferson Parish Home Rule Charter, a seven-member Council functions as the legislative and policy-making body of the Parish. The Parish President acts as the chief administrative officer. For purposes of representation, initially the Parish was divided into

2

No. 86-0265 (E.D. La. June 22, 1987), certain Jefferson Parish registered voters filed suit alleging that the structure of the Jefferson Parish councilmanic districts violated the constitutional requirement of one-person, one-vote.[3] The Floyd lawsuit terminated with a consent judgment that ordered the Parish to "more evenly distribute the population of the [Parish] among its four councilmanic districts" to ensure compliance with the requisite one-person, one vote principle. The Jefferson Parish Council amended Section 2.02 of the Home Rule Charter to reapportion the population distributions among councilmanic districts. This amendment, embodied in Ordinance No. 16932, was incorporated into the consent judgment and resulted in no district's having a black population in excess of 24%. Overall, the consent decree did not alter the 4-2-1 election scheme.[4] It only required that the Parish reapportion the four single member districts to bring it into compliance with one-person, one-vote principles.

Subsequently, in East Jefferson Coalition for Leadership and Development v. Parish of Jefferson, 691 F. Supp. 991 (E.D. La. 1988), voting rights organizations and individual registered voters brought an action against the Parish alleging that the 4-2-1 plan violated Section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973 et seq., and their rights under the Fourteenth and Fifteenth Amendments to the United States Constitution, and § 1983. Specifically, the plaintiffs complained that the then-existing electoral system in Jefferson Parish diluted black

_____

four council districts, each of which elected a single council member. Two "super-districts," one consisting of Districts 1 and 2 and a second consisting of Districts 3 and 4, each elected an additional council member. The seventh council member was elected from the Parish at-large. This plan was commonly referred to as the "4-2-1 plan."

[3]See Reynolds v. Sims, 377 U.S. 533 (1964) (establishing one-person, one-vote principle).

[4]See *supra* note 2.

3

voting strength. After a bench trial, the district court ruled that "the minority group is sufficiently large and geographically compact to constitute a majority within a single-member district."[5] The district court also found that the black residents of Jefferson Parish were politically cohesive, see id. at 1006, and that the Parish's electoral system impeded the ability of minority voters to elect representatives of their choice. See id. at 1001. The court rejected a proposed black-majority district and ordered the parties to submit alternative plans.

On February 16, 1990, the parties adopted a plan which included six single-member districts and one at-large district ("February 1990 Plan"). The district court subsequently approved the plan. Of the single member districts, District 3 contained a black majority with a total black population of 51.7%, according to the 1980 Census, and 56.3% black voter registration. On May 10, 1990, the Attorney General precleared this plan under Section 5 of the Voting Rights Act.[6] The Department of Justice ("DOJ") precleared the Parish's alternative plan. On appeal, the Parish challenged the district court's findings that the minority group was sufficiently large and geographically compact to constitute a single-member district; that the minority group is politically cohesive; and that a bloc voting white majority usually defeats the minority's preferred candidate. See Thornburg v. Gingles, 478 U.S. 30, 50-51 (1986) (establishing these as the three necessary preconditions to make a claim

---

[5]The district court, invoking FED. R. CIV. P. 52(b), amended its prior finding that blacks were widely dispersed throughout the district and ruled that "the minority group is sufficiently large and geographically compact to constitute a majority within a single-member district." East Jefferson Coalition for Leadership v. Parish of Jefferson, 926 F.2d 487, 491 (5th Cir. 1991).

[6]Section 5 of the Voting Rights Act requires that any change in a standard, practice, or procedure with respect to voting by a "covered jurisdiction" be submitted to the United States Attorney General for prior approval or "preclearance." 42 U.S.C. § 1973c; 28 C.F.R. § 51.1 et seq. (1989).

4

under § 2 of the Voting Rights Act).[7] This court affirmed and remanded for implementation of the February 1990 Plan. See East Jefferson Coalition for Leadership & Dev. v. Parish of Jefferson ("EJC"), 926 F.2d 487, 494 (5th Cir. 1991).

B

After remand from this court, the district court held a status conference stating that the Feb. 1990 plan had to be modified to be in accord with the population variances triggered by the 1990 Census.[8] The 1990 Census reflected an increase in the black voting-age population ("BVAP"). Moreover, since District 3 had lost population overall, it required reconfiguration to avoid a constitutional one-person, one-vote violation. The DOJ informed the attorneys for Jefferson Parish that it would require a benchmark, or a minimum 52.3% BVAP majority in District 3 in order to pre-clear a new redistricting plan drawn under the 1990 Census. The district court encouraged the parties to work together to formulate the necessary modifications and to adhere to a May 15, 1991 deadline for submission of the modified plan.

During the subsequent meetings among the Parish council members, each councilman brought certain political concerns to the attention of other councilpersons. One or more of the individual incumbent council members sought to include in their districts voters who could be expected to support them in a bid to gain reelection. Additionally, the Parish sought to avoid contests between

_____

[7]See generally, Steven J. Mulroy, The Way Out: A Legal Standard for Imposing Alternative Electoral Systems as Voting Rights Remedies, 33 HARV. C.R.-C.L. L. REV. 333, 343-46 (1998) (discussing Section 2 of the Voting Rights Act and the Gingles preconditions).

[8]According to the 1990 Census, 448,306 people reside in Jefferson Parish, of whom 331,894 (74.0%) are white and 78,263 (17.5%) are black. These figures represent a 3.6% increase in the black population since the 1980 census although the overall population of the Parish decreased by approximately 6,300 people.

incumbent council members.   In this regard, District 2 also received significant attention because it was likely to feature a race between incumbent councilmen James Lawson and Lloyd Giardina.

During the ensuing negotiations, a number of proposals surfaced among the council members. Councilman James Lawson's plan (the "Lawson Plan" or "modified plan") garnered the most support because it permitted other incumbents to maintain as much of their pre-1988 districts as possible. It retained the six-and-one councilmanic scheme, with six single-member councilmanic districts and one at-large seat ("6-1").  Additional adjustments were made to accommodate a particularly vocal constituent, Ida Saik, a resident of Maplewood.[9]  The Lawson Plan split some  precincts to accommodate changes in the numbers of registered voters[10] and included a black majority councilmanic district, District 3, with a BVAP of 57.40%.  By resolution No. 69122, passed on May 8, 1991, the Jefferson Parish Council adopted the modified plan.  All of the council members, with the exception of Giardina, voted in favor of the modified plan.

On May 15, 1991, Jefferson Parish filed the modified plan with the district court but the district court rejected the modified plan and admonished the parties for letting "politics" enter the districting process.  The district court appointed a special master to draw up a redistricting proposal for the court.  On June 10, 1991, the special master submitted a 6-1 redistricting plan to the district court containing a black councilmanic district with 49% BVAP, a BVAP  percentage less than the

---

[9]Ms. Ida Saik was the only Jefferson Parish resident who voiced her concerns to Councilperson T. J. Ward regarding the challenged redistricting plan during the 1991 negotiation process and through the time before the challenged plan was adopted by the Parish Council.  Ms. Saik adamantly expressed her views and frequently contacted councilpersons to ensure that her concerns were reflected in the final proposal.

[10]Jefferson Parish had often been required to split precincts prior to the 1991 redistricting of its Parish Council in order to accommodate changes in the numbers of registered voters in particular voting precincts or changes in State House and Senate district lines.

BVAP adopted in the Lawson plan. The trial court entered its judgment implementing the redistricting plan drawn by the special master but a panel of this court, in an unpublished *per curiam* opinion, found that the plan was a "Judge Made Plan" and impermissibly intruded "into the bailiwick of the legislative branch of local governments."

This court further found that the special master's plan "must fall for failure to include one district with a majority black voting age population." We held that the district court "should promptly adopt and implement a plan that, while applying the 1990 census data, otherwise remains as faithful as practicable to 'the' Plan, including a black voting age majority in District No. 3." This court also approved the modified redistricting plan submitted by the Jefferson Parish Council and instructed the trial court to issue an injunction directing the Parish to submit the modified plan to the DOJ for expedited review under section 5 of the Voting Rights Act. Thereafter, pursuant to our instructions, the district court was to order the implementation of the modified plan immediately upon receipt of the notice of pre-clearance.

After our decision and the district court's subsequent judgment revoking its previous judgment and ordering the Parish to submit the modified plan for preclearance, the Parish Council complied. The Parish Council submitted the modified plan to the DOJ by letter dated August 15, 1991.[11] The DOJ responded on August 27, 1991, in a letter which stated that the Attorney General did not interpose any objection to the specified change. The first elections using the modified plan were held in 1991. Two African-American candidates advanced to the run-off in District 3, and

---

[11]Again, the modified plan included a seven-member Parish Council comprised of six single-member districts and one at-large district. The black majority councilmanic district included a black voting age population of 57.4% under the 1990 Decennial Census.

7

Donald R. Jones was elected to the Parish Council.[12]

C

On July 28, 1995, Dennis Theriot and six other registered voters in District 3, along with the Maplewood Civic Association (collectively, the "Appellants"), brought suit against the Parish and Parish Council officials challenging the configuration of District 3. The Appellants deemed District 3 a racial gerrymander in violation of the Fourteenth and Fifteenth Amendments to the Constitution, and the Voting Rights Act of 1965, 42 U.S.C. §§ 1973 et seq (1994). The Appellants argued that their political voice was diluted by the fact that the Maplewood community is divided between District 3, represented by Councilperson Jones, and District 1, represented by Councilperson Ward.[13] In May 1996, the district court permitted the United States, the City of Kenner and various other Kenner officials to intervene to defend the plan.[14] After discovery and extensive motion practice, Judge Stanwood R. Duval, Jr., conducted a bench trial from March 10, 1997 to March 12, 1997. On April 25, 1997, he entered judgment for the Defendants.

The district court made findings of fact and drew conclusions of law. Factually, the district court found that political incumbency "drove the pencil" in designing District 3. One-person and one-vote considerations were paramount in configuring District 3 which the district court determined was sufficiently compact. In its discussion of compactness and contiguity, the district court described the

_____

[12]Donald R. Jones's election as the council representative for District 3 marked the first time this century that an African-American was elected to the Jefferson Parish Council. He successfully ran for re-election in 1995.

[13]Both councilpersons have supported programs in and beneficial to Maplewood.

[14]The Kenner Defendants intervened in this lawsuit to assert their interest in the continued three-way split of Kenner and Kenner residents' access to and influence over three council members elected from single-member districts and one council member elected at large.

geography of the Parish and the location of predominantly black communities within the Parish. The district court further found that the Parish was not unaccustomed to splitting districts in order to achieve political goals. The district court identified communities of interest within District 3 and found that an increase in the BVAP justified using a 52.3% benchmark for determining retrogression under Section 5 of the Voting Rights Act. Finally, the district court found, as a matter of fact, that vestiges of discrimination remain in Jefferson Parish.

As a matter of law, the district court held that the Appellants failed to carry their burden of proof regarding the predominance of race in the configuration of District 3. Consequently, the district court declined to apply strict scrutiny. The shape of the district, according to the district court, did not demonstrate circumstantially that race motivated the form of the district because District 3 was not configured to appear similar to a "Rorschac ink-blot;" "a bug splattered on a windshield;" or "a sacred Mayan bird." In short, because District 3 does not wind in a serpentine fashion, the district court found that it did not have any of the visual indices apparently obvious in in Hays v. State of Louisiana, 515 U.S. 737 (1995), Miller v. Johnson, 515 U.S. 900 (1995); and Shaw v. Reno, 509 U.S. 630 (1993)("Shaw I").

The district court further held that since it had determined that strict scrutiny did not apply and that no constitutional violation had occurred, no harm resulted in re-evaluating the issues in light of Shaw I and its progeny. In its conclusion, the district court emphasized that strict scrutiny did not apply yet explained that, even if it did, District 3 is narrowly tailored to meet a compelling State interest.

The district court denied Appellants' subsequent motions for a new trial or otherwise alter the judgment of the district court. On July 15, 1997, Appellants timely appealed the district court's

9

judgment.

## II

Appellants raise six issues on appeal.[15] We seek to determine whether the district court erred in (1) ruling that race did not predominate in the creation of the current District 3; (2) declining to apply strict scrutiny to the legislative act creating District 3; (3) ruling that a 52.3% black-voting age population was required in order to avoid a section 5 retrogression violation; (4) admitting and relying upon evidence pertaining to community-of-interest testimony and data assembled after the actual drawing of the districts; (5) making certain factual findings predicated on its assessment of witness credibility; and (6) granting defendants' motion to quash the depositions of counsel, Harry Rosenberg and M. Nan Alessandra.[16]

---

[15]During our adjudication of this matter, the Supreme Court issued its decision in Hunt v. Cromartie, 119 S.Ct. 1545 (1999). In Hunt, the Supreme Court addressed a challenge to North Carolina's Twelfth Congressional District as the product of unconstitutional racial gerrymandering. The Court held that it was an error for the district court to resolve the disputed fact of intent at the summary judgment stage. Substantively, Hunt is most instructive in those instances where voting rights challenges have been resolved after adjudicating a dispositive motion. In that regard, the posture of this case significantly differs from Hunt. The district court's resolution of the issues in this case occurred in the context of a three-day trial during which 55 exhibits were introduced and 22 witnesses testified.

[16]As we turn to the merits of these issues, we are mindful of our decision in EJC, affirming the district court's finding that the Parish's electoral voting scheme violated Section 2 of the Voting Rights Act. See EJC, 926 F.2d at 487. Because of the need to remedy the Section 2 violation, race was considered in drawing a plan with a majority-minority district. The relevance or consideration of race does not mandate a finding that race predominated.

10

A

Appellants bear the burden of proving an impermissible racial classification. See Miller v. Johnson, 515 U.S. 900, 916 (1995). Appellants may rely upon circumstantial evidence of the district's shape and demographics or more direct evidence bearing upon legislative purpose. See id. The district court found that "traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual and shared interests," see id. at 916, were not subordinated to race in drawing District 3. We review the district court's determination that race did not predominate for clear error. See Miller, 515 U.S. at 917, see also Shaw v. Hunt, 517, U.S. 899, 905 (1996) (Shaw II). It is well settled that "[a] finding is 'clearly erroneous' when [,] although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)).

In an effort to manufacture clear error, Appellants challenge every aspect of the district court's opinion. They contend that testimony regarding the drawing of the current districts, the documentary evidence in the record, the shape of District 3, and the racial geography within the Parish provides direct and circumstantial evidence of an impermissible racial classification. We disagree. The record reveals no clear error inasmuch as incumbency protection, maintaining communities of interest, addressing one-person, one-vote concerns and natural geographic conditions predominated in drawing District 3.

1.

In Bush v. Vera, 517 U.S. 952 (1996) (plurality opinion), the Supreme Court recognized,

11

"[i]n some circumstances, incumbency protection might explain as well as, or better than, race a State's decision to depart from other traditional districting principles, such as compactness, in the drawing of bizarre district lines." Id. at 967. Much of the discussion among the Parish Council members during the 1991 redistricting negotiations with the EJC plaintiffs centered on political concerns, particularly the likelihood that councilpersons Lawson and Giardina would each campaign for the single District 2 council seat. Each councilperson brought certain additional political and incumbency concerns to the negotiation process. Although the Lawson Plan resulted in a race between Lawson and Giardina in District 2, it garnered the most support because it met the political and incumbency concerns of the majority of existing councilpersons.

The record indicates that Councilperson Ward preferred the Lawson Plan because it resulted in fewer changes to his district, District 1. Councilperson Larry Hooper sought to maintain as much of his pre-1988 district as possible, particularly the communities of Kenner and River Ridge. He also voted for the Lawson plan. Councilperson Robert B. Evans, Jr. received no adverse comments from Parish residents concerning the adoption of the Lawson Plan and ultimately joined five other councilpersons in voting to adopt the plan. Councilperson Edmond Muniz similarly determined that the Lawson Plan was politically advantageous and improved his prospects for re-election. While this court's previous finding of a Section 2 violation required the Parish to redraw its districts, we find that the issue of race was plainly subordinate to the majority of the councilpersons' preoccupation with protecting incumbency and maintaining other political advantages.[17]

We offer some examples of the testimony we found common throughout the proceedings and

---

[17]Indeed, the residents of Kenner sought to intervene in this case in order to maintain a tripartite split of its community and the attendant ability to exert political influence in at least three districts.

which support both the district court and our findings. Councilman Giardina testified:

> Q.  Was race the primary consideration in the drawing of the current district three?
>
> A.  The current district three?
>
> Q.  Yeah, primary?
>
> A.  Or the current district two?
>
> Q.  Current district three.
>
> A.  You can't answer one without the other, they go together.
>
> THE COURT: Just answer the question as to district three right now and you can explain your answer.
>
> THE WITNESS: I don't think so . . . and the reason I'm saying I don't think so is because if you drew one district it related to the other district, you couldn't draw just district three [;] you had to draw six districts.

(Tr., Vol. I, at 34).  Later, Councilman Giardina testified on the relevance of politics:

> Q.  Let me go back to the districting process involved[;], did politics govern that process in your opinion?
>
> A.  It was the prevailing factor.

(Tr., Vo l. I, at 43).  In subsequent testimony, Councilman Giardina acknowledged the benefit the

Lawson Plan offered to incumbent council members:

> Q.  That preference to keep their optimum areas was the driving force in their voting for the redistricting configuration that we have today, is that right?
>
> A.  That's absolutely right.

(Tr., Vol. I, at 51).

Equally compelling is the testimony of Councilman Lawson:

> Q.  Isn't it a fact that in making the current districts you were trying to maximize the black-voter population of District 3?

13

A.    I was trying to address the concerns of all Councilmen, you know.  Bob Deviney would call me.  Hooper would call me.  Muniz would call me.  "Butch" would call.  Everybody was calling me and saying, "Look, Jim —"

MR. VARRECCHIO: Your Honor, that's not responsive.

THE WITNESS: "—I want to make sure it's in here or there," so I was drawing a district that would address everyone's concerns, and this is what came out of it.

Q.    I want to talk to you about District 3 . . . . Isn't it a fact that you were trying to maximize the black population of District 3?

A.    I think what I was trying to do was simply draw a district that I make sure of my incumbency that I could run in and at the same time make sure I had the right numbers of people in each council district.

(Tr., Vol. XVIII, at 87).  Still not satisfied with Councilman Lawson's response, opposing counsel later asked essentially the same question again:

Q.    Okay.  In drawing the current District 3, would it be fair to say that race was your primary consideration in drawing its boundaries?

A.    No . . . I mean, I was looking to try to retain as much [of] my old district as possible.

(Tr., Vol. XVIII, at 125).  Our review of the record leads us to conclude that the inclusion or exclusion of communities was inexorably tied to issues of incumbency.[18]

_____

[18]We distinguish this case from Miller v. Johnson, 515 U.S. 900 (1995).  In Miller, the Court struck down Georgia's Eleventh Congressional District after finding that race was the predominating factor.  See Miller, 515 U.S. at 918.  The Court reached its decision with relative ease given concessions by the State of Georgia and evidence revealing the DOJ's insistence on certain race-based revisions to Georgia's redistricting plan.  See id. at 917-18.  The Court found that the State of Georgia had acquiesced to the DOJ's "maximization agenda"which the DOJ had made clear through its letters objecting to proposed districts and by three preclearance rounds.  See id. at 917.  Additionally, the State of Georgia conceded that it added certain communities and split other communities with the main objective of increasing the black population of the Eleventh Congressional District.  See id. at 918.

Stated simply, there was no proverbial big brother manipulating the process of drawing the districts.  The Parish did not abdicate its responsibilities to the DOJ or confront pressure to include or exclude communities.  When requested, the DOJ properly advised the Parish of a benchmark under Section 5 of the Voting Rights Act.  Nevertheless, among other evidence, Appellants highlight Parish

2.

Like the district court, we also find that District 3 is composed of communities of interest.[19] In Miller, the Court held that "a State is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests." Miller, 515 U.S. at 920. States, however, may not engage in racial stereotyping, that is, assuming that the voters of the same race "t hink alike," share the same political interests, and prefer the same candidates. See id. (explaining that racial stereotyping is at odds with equal protection mandates). The same logic applies to Jefferson Parish.

The record indicates that the neighborhoods and subdivisions that now make up District 3 contain low-income residents who are less-educated, more often unemployed, and more poorly-housed than voters in other districts.[20] District 3 residents have common social and economic needs. See Lawyer v. Department of Justice, 521 U.S. 567, 581 (1997) (finding a community of interests

---

Council research staffer Gandolfi's letter to the DOJ explaining that particular precincts were split to enhance both the black population and the BVAP of District 3. Yet at trial, even Gandolfi concluded that political considerations were paramount in the design of the Lawson plan.

[19]In this section, we also address the merits of Appellants' fourth issue: whether the district court erred in admitting evidence bearing upon communities of interest. Again, we find no clear error.

[20]A plethora of civic and community organizations dedicated to addressing issues of housing, education and poverty exist within Jefferson Parish and District 3. Po litical organizations whose members are predominantly black existed in Jefferson Parish as early as the 1940s. Generally these groups draw their memberships from Kenner, Bunche Village, Little Farms, Lincoln Manor, and other predominantly black neighborhoods on the East Bank. These organizations also have drawn support from Marrero, Avondale, Harvey, and other black neighborhoods located on the West Bank. Since their inception, some of these organizations have lobbied for paved streets and water and sewer lines. Others were organized to improve recreation facilities, reduce traffic, combat crime and drugs, and improve drainage. Razing dilapidated housing emerged as a focal point for another organization. Many of these social ills continue to infect the communities making up District 3.

as predominantly urban and low-income even though the district crossed the Tampa Bay). Given the common thread which binds the black voters within District 3, they "are entitled to an effective voice in the electoral process and t o an influence over the outcome of elections." See East Jefferson Coalition for Leadership and Development v. Parish of Jefferson, 691 F.Supp. 991, 1008 (E.D. La. 1988).

Additionally, we reject Appellants' argument that information pertaining to the socio-economic conditions of the Parish was not properly before the district court since the data was not available to the councilpersons at the time they drew the districts. Appellants rely on the Supreme Court's decision in Vera. There the Court refused to overturn the district court's finding that race predominated over other traditional redistricting principles particularly since the State of Texas's supporting data was not available to the Legislature in any organized fashion before the challenged district was created. See Vera, 517 U.S. at 966. The Court also held that the State was not required to compile a comprehensive administrative record and courts are not required to dismiss facts not explicitly mentioned in the redistricting plan's legislative history. See Vera, 517 U.S. at 966.

We find that the issues facing Jefferson Parish, including those that affect citizens who reside in the current District 3, are not new; rather they are remnants of the historical subjugation of blacks in the State of Louisiana and in Jefferson Parish. Indeed, evidence concerning the socio-economic conditions of the Parish's neighborhoods and subdivisions was produced in the preceding EJC litigation, see e.g., EJC, 926 F.2d at 490 (exploring issues of political cohesion), as well as in this case. Many of the same councilpersons were involved in the preceding litigation and are well aware of the socio-economic conditions throughout Jefferson Parish.

3.

16

We similarly decline to find clear error in the district court's determination that overwhelming evidence demonstrated that one-person, one-vote considerations were paramount in configuring the districts. The one-person, one-vote provision requires districts to achieve population equality "as nearly as is practicable." Abrams v. Johnson, 521 U.S. 74, 98 (1997). The record includes the testimony of Kenneth Hughes, the Director of the Council's Research and Budget Staff, and Alan Gandolfi, a research analyst and staff attorney. Both testified that one-person, one-vote considerations emerged as their primary concern while working on the various redistricting plans. Additionally, the record reveals a cause and effect relationship between Lawson's efforts to include politically advantageous communities in District 2 and alterations to the boundaries of District 3 to satisfy one-person, one vote requirements. Overall, we find that the district court's conclusion that one-person, one-vote concerns were paramount is fully supported by the record.

4.

Geographically, the district court found that the past redistricting tradition in Jefferson Parish did not strictly adhere to geometric standards of compactness. According to the district court, the "very irregular" geography and topography of the Parish (including the fact that it is 50% water) substantially limits the ability of the Parish to adhere to such standards. Consequently, the district court rejected Appellants' assertion that the District was bizarre on its face.[21] We agree and find that any irregularity associated with the shape of District 3 is derivative of politics, joining communities of interest, one-person, one-vote concerns, and the geography and population

---

[21]The district appears "V" in shape.

17

distribution in the Parish.[22] With regard to geography and demographics, it is most apparent that the black population resides in an east-west direction, as opposed to north-south. Consequently, remedying the Section 2 violation required a district which, in some measure, proceeded in an east-west direction rather than the usual north-south direction.

5.

In short we are not persuaded that the district court erred in finding that race did not predominate in drawing District 3. The record presents bountiful evidence supporting the district court's finding that political incumbency, communities of interest, one-person, one-vote, and geography dwarf issues pertaining to race. We find particularly relevant the following colloquy between the court and Mr. Gandolfi:

THE COURT: To some extent, right down to this case, to some extent, if you look at the shape of these districts, certainly race had something to do with the shape you adopted?

THE WITNESS: Certainly, we had to maintain that majority black.

THE COURT: To some extent, one man one vote dictates the shape?

THE WITNESS: Right.

THE COURT: And to some extent, the geographical boundary of the Parish dictates the shape?

THE WITNESS: To a great extent.

THE COURT: And to some extent incumbency and political concerns dictate the shape?

THE WITNESS: I would say of the four criteria you just mentioned, the last one, the political concerns had the most effect on exactly how those other

_____

[22]Like the district court, we disregard the division or splitting of unpopulated precincts to ensure contiguous districts because no communities of interests were affected.

18

three goals were achieved.  There were different ways of doing it.

(Tr., Vol. 1, at 147).

Appellants implicitly argue that *any* consideration of race, even where such consideration is *de minimis*, mandates a finding that race predominates.  This implication or argument has been squarely rejected by Miller, Vera, Abrams and the EJC litigation; therefore, we cannot agree.[23]  Issues of race were relevant, inasmuch as the Parish Council was directed to remedy a Section 2 violation, yet did not predominate.

B

Strict scrutiny analysis is required when a plaintiff proves that race is the "predominant factor" motivating a redistricting decision. See Miller, 515 U.S. at 920.   The Supreme Court has recognized that "[s]trict scrutiny does not apply merely because redistricting is performed with consciousness of race . . . . Nor does it apply to all cases of intentional creation of majority-minority districts."  Bush, 517 U.S. at 958.  In like manner, this court has opined that "strict scrutiny does not apply to all cases involving the intentional creation of majority-minority districts."  Clark v. Calhoun County, Miss., 88 F.3d 1393, 1404 (5ᵗʰ Cir. 1996).  Race is inherently a consideration where, as here, a governing body must respond to violations of Section 2 of the Voting Rights Act.  See id. at 1407.

Had the Appellants demonstrated that race was the predominant factor, the burden would have been on the Parish to demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest.  See Miller, 515 U.S. at 920.  Again, the Appellants have failed to demonstrate

[23]If we were to follow Appellants' argument to its logical conclusion, no court could find or ever require any jurisdiction to address a Section 2 violation because race emerges as a relevant issue. Indeed, much of Appellants' argument appears designed collaterally to attack this court's previous finding of a Section 2 violation.

that race predominated, a prerequisite for strict scrutiny analysis. In an abundance of caution, the district court discussed the merits of this issue; we decline to follow a similar course and turn our attention to the next issue, avoiding a Section 5 retrogression violation.

C

Jefferson Parish is covered by Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. Consequently, the Parish may not "enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964," unless it secures preclearance. Preclearance is achieved in one of two ways, filing a declaratory judgment action in the United States District Court for the District of Columbia or submitting the change to the United States Attorney General. In either forum, it is incumbent upon the Parish, or submitting jurisdiction, to prove that the voting change does not have a discriminatory purpose or effect. Changes which have not been pre-cleared are unenforceable. See 42 U.S.C. § 1973c; Clark v. Roemer, 500 U.S. 646 (1991).

In Beer v. United States, 425 U.S. 130, 141 (1976), the Court held that a voting change may not be pre-cleared if it "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." Retrogression occurs when "the ability of minority groups to participate in the political process and to elect their choices to office is augmented, diminished, or not affected by the change affecting voting." Id. at 141. Generally, a determination of retrogression requires a comparison between the proposed voting change and the last legally enforceable practice or procedure used by the jurisdiction. See 28 C.F.R. 51.54 (b)(1) (1999). The latter is commonly referred to as a benchmark.

The district court found, as a matter of fact, that Jefferson Parish was justified in using 52.3%

20

BVAP as the appropriate benchmark for determining retrogression under Section 5. The district court based its determination on the increase in the black population in District 3 under the findings of the 1990 Census. While the Lawson Plan overshot the benchmark by nearly 5 percentage points, the district court found that the Appellants had not demonstrated that the DOJ coerced the Parish into designing a district that maximizes District 3's black population as criticized in Miller. We review the district court's findings of fact for clear error and find none. See FED. R. CIV. P. 52(a).

We reject the Appellants' reliance on Abrams and Young v. Fordice, 520 U.S. 273 (1997) to argue that only the last districting scheme used by the jurisdiction to hold elections is the proper benchmark. Appellants have misread both cases.[24] In Abrams, the Supreme Court rejected appellants' proposed benchmark because it had never been in effect and was found to be unconstitutional. See Abrams, 521 U.S. at 96-97. The plan for unitary voter registration for state and federal elections at issue in Young suffered similar deficiencies. Specifically, the Court found that the plan was not "in force or effect" because those seeking to administer the plan had abandoned it as soon as its unlawfulness became apparent.

Appellants' invitation to disregard census data in favor of outdated information is impractical. The parties realized the 1990 Census would impact redistricting; therefore, they promulgated an interim plan. Once the 1990 Census provided figures which were not favorable to the Appellants,

---

[24]Appellants read these cases as requiring the district court to use the last districting scheme used by the jurisdiction to hold elections as the proper benchmark. Accordingly, Appellants reject the March 1990 interim districting plan as establishing the benchmark. Instead, Appellants never disclose what the benchmark should have been, but seem to suggest that 46% was the proper benchmark. Appellants deem "ameliorative" all of the post-1990 Census "6-1" plans and argue that the post-1990 Census plans violate Supreme Court precedent because the DOJ forced the Parish Council to adopt a plan with maximum benefits to minority voters. To substantiate its argument, Appellants exaggerate and misconstrue the nature of the communications between the DOJ and the Parish Council.

21

they sought to disregard its import. Nevertheless, the interim plan was pre-cleared and upheld by the court. A majority-minority district which fell below the documented increase in the BVAP would have been subject to a Section 2 challenge.

By insisting on benchmark figures wholly inconsistent with increases in the BVAP, Appellants attempt to sentence minorities complaining of vote-dilution to a fate similar to Sisyphus.[25] Even though this court has found a Section 2 violation and required the parties to make adjustments based on the 1990 Census, Appellants would have us turn the Appellees away and have them prove a Section 2 violation all over again. We decline to impose such a requirement. Once a litigant has demonstrated vote dilution and the court has directed redress, the litigant need not prove vote dilution once again before a court can assess the merits of the proposed remedy. Otherwise, it is conceivable that courts may never reach the merits of the proposed remedy. Appellants have failed to demonstrate clear error. Again, we are satisfied that to the extent the current District 3 exceeds the benchmark, political incumbency and other political concerns were the driving force.

D

Appellants argue that the trial court erred in deciding which witnesses to credit and which to discount at trial. Factual findings from a bench trial are reviewed under the clearly erroneous standard. See Odum v. Frank, 3 F.3d 839 (5th Cir. 1993); FED. R. CIV. P. RULE 52(a). A finding is clearly erroneous when despite evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. See Cupit v. McClanahan Contractors, Inc., 1

---

[25]Zeus sentenced Sisyphus, the mythical King of Corinth, to an eternity in Hades trying to push a boulder uphill to the top. Yet every time Sisyphus neared the crest, the weight of the rock would turn it back and the rock would roll back towards the plain. See Homer, THE ODYSSEY, (E.V. Rieu & D.C. H. Rieu trans., Penguin Classics 1991).

F.3d 346, 348 (5th Cir. 1993). We conduct our review to determine whether the district court's account of the evidence is plausible in light of the record. See Anderson v. City of Bessemer City, 470 U.S. 564, 573-74 (1985). Where the evidence can support findings either way, a choice by the trial judge between two permissible views of the weight of the evidence is not clearly erroneous. See id.

The burden of showing that the findings of a district court are clearly erroneous is heavier if credibility of witnesses is a factor in the district court's determination. See Coury v. Prot, 85 F.3d 244, 254 (5th Cir. 1996). A trial court's decision to credit the testimony of one, two, or more witnesses, each of whom has told a coherent, facially-plausible story that is not contradicted by extrinsic evidence, and can virtually never be clear error. See Justiss Oil Co., Inc. v. Kerr-McGee Refining Corp., 75 F.3d 1057 (5th Cir. 1996). Appellants' argument fails to surpass the standard of review under clear error. As opposed to directing this court's attention to extrinsic evidence, Appellants use positive adjectives to describe beneficial testimony and negative adjectives to describe unfavorable testimony. However, the district court's analysis turns on choosing between plausible alternatives and Appellants have failed to show clear error in this regard. This court declines to depart from the district court's assessment of the credibility of the witnesses except in the rarest of circumstances. See Travelers Indem. Co. v. Clavert Fire Ins. Co., 798 F.2d 826, 836 (5th Cir. 1986). We have reviewed the record and are satisfied that the evidence supports the district court's assessment of witness credibility.

E

We review a district court's decision denying discovery, including quashing deposition subpoenas, for abuse of discretion. See Tiberi v. CIGNA Ins. Co., 40 F.3d 110, 112 (5th Cir. 1994);

23

see also Hastings v. N. E. Indep. Sch. Dist., 615 F.2d 628 (5th Cir. 1980).

The magistrate judge rejected the Appellants' argument that they were entitled to take the depositions of defendants' trial attorneys, Harry Rosenberg and M. Nan Alessandra. The magistrate judge found that "plaintiff-intervenor's [Cleta White] premise that defendant's attorneys are the only persons with information about how or why redistricting or a remedy occurred is rank speculation hovering near the absurd." In like manner, the district court rejected this argument. Nevertheless, the district court did provide the Appellants with an alternative to deposing the Parish's attorneys, by stating that "the record in this case is voluminous and presents a more than adequate alternative source for the proof intervenor's counsel seeks to meet the standard of Miller."

Notwithstanding Appellants' reference to material outside the record, Appellants have not met the high standard for demonstrating abuse of discretion.[26] The entire record in the EJC case was available to the parties in this litigation. Moreover, the district court referred the Appellants to John Tanner of the DOJ as the person who would have the best knowledge and information regarding the sought information. Deposing Rosenberg and Alessandra was also complicated by the fact that they were counsel for the opposing side. Generally, federal courts have disfavored the practice of taking the deposition of a party's attorney; instead, the practice should be employed only in limited circumstances. See Shelton v. American Motors Corp., 805 F.2d 1323, 1327 (8th Cir. 1986). Given the alternatives and Appellants' failure to demonstrate abuse of discretion, this claim must fail.

III

Resolution of this case turns on the issue of whether race predominated in the redistricting

---

[26]An appellate court may not consider new evidence furnished for the first time on appeal and may not consider facts which were not before the district court at the time of the challenged ruling. See Great Plains Equip., Inc. v. Koch Gathering Sys., Inc., 45 F.3d 962 (5th Cir. 1995).

plan.  Like the district court before us, we cannot find that race predominated.  While relevant, issues pertaining to race were subordinated to concerns for political incumbency, joining communities of interest, satisfying one-person, one-vote requirements, and geographical realities.   Since the Appellants fail to demonstrate that race predominated, we need not apply strict scrutiny analysis to the formation of District 3.   They record and Judge Duval's well-supported findings reflect careful, thorough consideration of the issues in this sensitive case.  The judgment of the district court is therefore AFFIRMED.