United States Court of Appeals
Fifth Circuit

**F I L E D**

**November 25, 2003**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 02-31065

---

WILLIAM H. PREJEAN; ET AL,

                                        Plaintiffs,

HARRY J. CHAUVIN; EMILE POCHE; NED C. GOLDSTON;
DENNIS P. LOUVIERE; EUGENE J. SCHEXNAYDER,

                                        Plaintiffs-Appellants,

                    versus

M. J. FOSTER, JR., Governor of the State of Louisiana;
RICHARD P. IEYOUB, Attorney General of the State of
Louisiana; W. FOX MCKEITHEN; JERRY M. FOWLER,
Commissioner of Elections of the State of Louisiana;
STATE OF LOUISIANA,

                                        Defendants-Appellees,

        and

JANICE G. CLARK; ORSCINI B. BEARD; EDDIE G.
CRAWFORD; VOTER INFORMATION PROJECT, INC.,
LOUIS SCOTT; SYLVIA COOKS; CONNIE SADLER;
LLOYD DANGERFIELD; TOM NELSON; ALBERT
RICHARD; BRENDA FORD; EDWARD LARVADAIN;
JOSIE FRANK; NORBERT C. RAYFORD,

                                        Intervenor Defendants-Appellees.

--------------------------------

JOHN OREN, ET AL.,

                                                        Plaintiffs,

ROBERT J. HEATH,

                                                Plaintiff-Appellant,

                                versus

M. J. FOSTER, JR., also known as Mike Foster, Governor
of the State of Louisiana, in his Official Capacities; RICHARD
IEYOUB, Attorney General of the State of Louisiana, in his
official capacity; W. FOX MCKEITHEN, Secretary of State
for the State of Louisiana, in his official capacity; JERRY M.
FOWLER, Commissioner of Elections for the State of
Louisiana, in his official capacities,

                                                Defendants-Appellees.

_____

Appeal from the United States District Court for
the Middle District of Louisiana
(USDC No. 96-CV-3418)

_____

Before REAVLEY, HIGGINBOTHAM and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

The questioned legislation (Act 780) created a subdistrict with an

approximately 75 percent black population and its voters authorized to elect 1 of the

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion
should not be published and is not precedent except under the limited circumstances
set forth in 5TH CIR. R. 47.5.4.

2

5 district judges. The other subdistrict is 80 percent white and its voters authorized to elect 4 of the 5 judges. Plaintiffs challenged this act as violative of the Equal Protection Clause of the Fourteenth Amendment, the Fifteenth Amendment, and Section 2(a) of the Voting Rights Act. A bench trial was conducted in which the plaintiffs' claims were dismissed.

Appellees have challenged the appellants' standing insofar as some of the plaintiffs may not have proved that they live in the majority black subdistrict. There must be evidence in the record that at least one of the plaintiffs lives in the black majority subdistrict. In cases with multiple plaintiffs, the presence of at least one party with standing makes the case justiciable. Dep't of Commerce v. U.S. House of Representatives, 525 U.S. 316, 330 (1999). Thus, if any of the extant plaintiffs, Emile Poche, Ned C. Goldston, Dennis P. Louviere, produced evidence of their residence in sub-district 1, then the court may proceed to the merits. Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls, 536 U.S. 822, 827 n.1 (2002). All three plaintiffs testified at trial that they were only able to vote for Judge Turner in the 23rd Judicial District Court elections which necessarily means that they lived in the relevant subdistrict. See Tr. at I-28, I-36, II-22. The standing requirement has been satisfied.

This court reviews evidentiary rulings under an abuse of discretion standard. See Green v. Adm'rs of Tulane Educ. Fund., 284 F.3d 642, 660 (5th Cir. 2002).

3

This is a demanding standard which is met only when no reasonable person could take the trial court's adopted view. See Whitehead v. Food Max of Miss., Inc., 332 F.3d 796, 803 (5th Cir. 2003). Even if there is a showing of abuse of discretion, the abuse is only reversible is the error affected a substantial right of the complaining party. See Green, 284 F.3d at 660.

First, appellants object to the exclusion of the legislative history and pre-clearance materials from a series of redistricting acts passed by the Louisiana Legislature in the years before and after passage of Act 780. Appellants felt this legislative history would provide evidence of the state's racial preoccupation. The district court excluded the evidence for failing to meet FED. R. EV. 401's relevancy requirement.

When determining whether a facially neutral law is racially discriminatory law, the court ought to consider the legislative history of that law. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 268 (1977). The history of a legislative decision helps the court adduce legislative motivation. Id. Historical background of the "specific sequence of events leading up [to] the challenged decision" may also prove instructive. Id. at 267. Here, the district court clearly considered both the legislative history of Act 780 as well as background

materials demonstrating the state's concern with race. The court need not consider every facet of the historical background from which the legislation emerges. While Act 1069 was a precursor to Act 780, no election was ever held under its subdistricting plan. This makes the legislative history surrounding Act 1069 substantially less instructive than the legislative history of Act 780 itself. Similarly, Acts 838, 839, and 844 of 1989 and Act 145 of 1994 did not deal directly with the subdistricting of the 23rd Judicial District Court ("JDC") but instead with various other subdistricts within the state. It was not unreasonable for the court to conclude that the legislative history of these acts would not shed light on the state's intent to create a majority black subdistrict in the 23rd JDC. The excluded legislative history could only provide tenuous inferences as to the state's reasoning process in Act 780, whereas the history to Act 780 and the correspondence with the Department of Justice over the construction of the 23rd JDC itself provided much more direct evidence of the state's intent in this instance. There was no abuse of discretion.

Appellants also complain about the exclusion of evidence demonstrating the adverse effects of racial subdistricting. This evidence includes testimony from Representative Joseph Accardo, Judge Pitcher, and Judge Jones as well as the post trial proffer of several news articles. The district court concluded that this evidence

5

did not bear any relevance to any of the questions raised about the possible violations of the Fourteenth Amendment, Fifteenth Amendment, or Section 2 of the Voting Rights Act. Whether or not the practice of racial subdistricting is harmful does not address whether or not there was a violation of an identified right or statute. We find no abuse of discretion.

*Race or traditional considerations in the state's creation of the subdistrict*

In determining whether a legislature's districting plan violates the Equal Protection guarantee of the Fourteenth Amendment, the appellants carry a demanding burden to show that the legislature's motive was predominantly racial, not political. See Easley v. Cromartie, 532 U.S. 234, 241 (2001). In creating a majority-minority district, such as the one in question here, the plaintiffs "must show at a minimum, that the 'legislature subordinated traditional race-neutral districting principles . . . to racial considerations." Id. (quoting Miller v. Johnson, 515 U.S. 900, 928 (1995) (O'Connor, J. concurring)). Race is a permissible factor so long as it is not "the '*predominant* factor' motivating the legislature's districting decision." Id. (internal citations omitted) (emphasis in the original). Traditional districting concerns include such factors as one person-one vote, the protection of

political incumbents, compactness, and reflection of communities of interest. See Chen v. City of Houston, 206 F.3d 502, 512 (5th Cir. 2000).

Legislatures, rather than courts, are institutionally better suited to make districting decisions, so courts must "exercise *extraordinary caution* in adjudicating claims that a State has drawn district lines on the basis of race." See Easley, 532 U.S. at 242 (quoting Miller, 515 U.S. at 915 (emphasis added in Easley)). Courts should be especially cautious when the legislature has proffered a legitimate political explanation for the districting decision and the "voting population is one in which race and political affiliation are highly correlated." Id.

Ascertaining legislative intent is a fact question. Prejean v. Foster, 227 F.3d 504, 509 (5th Cir. 2000). Therefore, this court will review the district court's findings for clear error. See Easley, 532 U.S. at 242. This is a deferential standard under which "a reviewing court must ask whether, 'on the entire evidence,' it is 'left with the definite and firm conviction that a mistake has been committed.'" Id. (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)). Where evidence can be viewed to support different findings, the choice between the views of the evidence is not a clear error. See Theriot v. Parish of Jefferson, 185 F.3d 477, 490 (5th Cir. 1999).

We review the direct and indirect evidence of discrimination. Id. at 484. This is necessary because

> [e]vidence that blacks constitute even a supermajority in one congressional district while amounting to less than a plurality in a neighboring district will not, by itself, suffice to prove that a jurisdiction was motivated by race in drawing its district lines when the evidence also shows a high correlation between race and party preference.

Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999). The plaintiffs submitted history surrounding a prior settlement, the Section 5 preclearance submissions, racial statistics that were submitted to the Department of Justice, and expert testimony about the subversion of traditional districting principles. To counter this evidence, the Defendants provided evidence from: Judge Alvin Turner who drew the subdistricts; then Representative Joseph Accardo who supported Act 780 in the legislature; and from Dr. Richard Engstrom, an expert in political redistricting. The district court concluded that the construction of the 23rd JDC employed traditional redistricting criteria, that race was not a predominant factor, and thus, strict scrutiny was not triggered.

After reviewing the record, this court is satisfied that the Louisiana

8

Legislature's motivation in redistricting was not driven by race. The testimony of Judge Alvin Taylor, who drafted the subdistricting plan, strongly suggests that he was motivated by traditional districting concerns. While race may have been a relevant factor, the trial court did not clearly err in its conclusion that Judge Turner was most concerned with drawing the sub-district to include precincts that supported him and to reflect the concerns of incumbent judges. Appellants suggest that incumbency protection evolved into an issue of race because incumbent white judges were able to maintain their judgeships in the majority white district. This court sees no evidence suggesting Alvin Taylor drew the districts with the motivation of protecting white judges per se. Rather, it so happened that all of the incumbent judges were white and Taylor redrew the lines to protect them. Protecting incumbent judges is a traditional and legitimate districting concern. Chen, 206 F.3d at 512. Turner's testimony was bolstered by Representative Accardo who was the lead representative supporting Act 780. He testified that he supported Act 780 for political reasons and that while race was a concern, it was not the predominant factor. Both Accardo and Turner provided an alternate, credible explanation for the subdivision of parishes and the lines drawn through Lutcher, Donaldsonville, and Gonzales– Turner wanted to protect incumbents while capturing areas that had provided strong support for him in the past. It is not for this

9

court to second-guess the trial court's assessment of these witnesses' credibility. The defendants' expert witness, Dr. Engstrom, also provided ample support for this explanation. After looking at the subdistricts created by Act 780, Engstrom concluded that while race and support for Turner were clearly intermingled, Turner's map was consistent with and showed concern for traditional districting concerns. Both Accardo and Engstrom also countered the argument that the racial data compiled and submitted to the DOJ in support of Section 5 preclearance demonstrated that race was the motivating factor in the legislature's districting decisions.

While the legislative history behind Act 780 and the racial statistics accompanying Louisiana's Section 5 preclearance materials do provide some evidence of race as a serious concern in the redistricting process, they are not so persuasive as to overcome the strongly deferential review due both the legislature and the trial court. Therefore, we uphold the trial court's determination that race was not a predominant factor in the creation of a black majority subdistrict under Act 780. We need not decide whether the redistricting plan was in pursuit of a compelling state interest and whether it was tailored to achieve that compelling interest.

*Fifteenth Amendment and Section 2 of the Voting Rights Act*

When race is the predominant factor in motivating the way in which the subdistricts were drawn, there may be a denial of the right to vote under the Fifteenth Amendment. See Prejean, 227 F.3d at 518-19. Gomillion v. Lightfoot held that if redistricting was used as a device to disenfranchise Negro citizens from voting in a municipal election while leaving all white voters in the same district, it would show that the act in question "was not an ordinary geographic redistricting measure even within familiar abuses of gerrymandering." 364 U.S. 339, 341 (1960). Yet no such disenfranchisement is present here, as we agree with the district court's assessment that the boundaries were drawn with traditional political concerns rather than race predominating.

Similarly, we also agree with District Court's assessment that there was no violation of Section 2 of the Voting Rights Act. Section 2 of the Voting Rights Act states that "[n]o voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State of political subdivision in a manner which results in denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . . ." 42 U.S.C. § 1973(a) (2001). Yet there is no evidence of vote dilution here. Since political decisions guided the

11

districting process, there is no reason to believe the voting strength of any particular racial group has been diluted.

AFFIRMED.